IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


**SHARON K. FLEURY,**

      **Plaintiff,**

**v.**                                                **CIV 02-774 LAM**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

      **Defendant.**


# **MEMORANDUM OPINION AND ORDER**

Plaintiff Sharon K. Fleury previously worked as, among other things, a secretary, hotel maid, home health care aide, and "youth director." *See, e.g., Administrative Record* ("*Record*") at 61-62, 251, 259, 292. Born in January 1957, at age thirty-eight she first applied for benefits in 1995, based on obesity, diabetes, depression, headaches, and joint pain, that she alleged rendered her disabled as of January 1995. An Administrative Law Judge ("ALJ") found her capable of doing sedentary work and therefore not disabled at Step 5 under the "grids." The Appeals Council declined review in November 1997. The matter was not appealed further – the Court's records show no prior case by Plaintiff. *See, e.g., id.* at 27-29, 207-211, 218-19.

Though she continued working, she next applied for benefits in October 1998, based on the same conditions, plus fatigue and back pain, that she alleged rendered her disabled as of September 1998. *See e.g., id.* at 236-37, 243, 250, 258, 269, 287, 289-91, 294, 296, 469. ALJ Gary L. Vanderhoof found that Plaintiff has the residual functional capacity to perform light work and that

she could return to her prior work as a youth counselor. He therefore denied benefits at Step 4. *Id.* at 19-20. After considering additional evidence Plaintiff submitted, the Appeals Council again declined review, thereby rendering the ALJ's decision final. *See id.* at 8-10, 452-62.

This matter is before the Court on Plaintiff's motion to remand this matter for further proceedings, where she asserts that the ALJ committed three errors. *See Doc. 11.* Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties consented to have a Magistrate Judge serve as the presiding judge and enter final judgment. *See Docs. 12, 13.* Subsequently, as part of a reassignment of cases, this matter was transferred from Magistrate Judge Smith and reassigned to me. Though much of the record pertains to Plaintiff's first application that is not before me, I have nonetheless read and carefully considered the entire voluminous record. I find that Plaintiff's motion should be denied and the decision of the Commissioner affirmed.

## I. Standard Of Review

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief. *E.g., Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1497-1500 (10th Cir. 1992). My assessment is based on a review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency. *E.g., Casias v. Sec'y of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir. 1994) (citation omitted).

## **II.  Factual Background**

None of the medical evidence from Plaintiff's treating sources physicians submitted in connection with her first or second application mention any limitation on Plaintiff's ability to work. Nor did any treating source submit an opinion on her limitations prior to ALJ Vanderhoof's opinion.

### *A.  Consulting Psychiatrist Re:  First Application*

In 1986 the Department of Vocational Rehabilitation sent Plaintiff for a psychological evaluation in connection with the possibility of being hired by the Salvation Army.  The psychologist who evaluated Plaintiff was of the opinion that she had "a Borderline Personality Disorder with unstable, dependent, avoidant, impulsive, depressive and paranoid features [and] a Psycho-somatic and Somato-psychological interaction of physical and emotional reactions with a holistic personal framework." *Record* at 95.  He was of the opinion that if the Salvation Army gave her the job, she "is likely to benefit from short-term help," and that if it turned her down, she "will desparately (sic) need a therapist." *Id.* at 97.  He so concluded because of Plaintiff's difficult childhood and multiple divorces, and because she was hoping to get the job. *See id.* at 96-97.  He mentioned that despite a "Borderline" diagnosis, people "can make pretty remarkable shifts from 'collapse' to 'health,'" and rated her prognosis as fair for training and work. *Id.* at 97.

Plaintiff got the job and worked as a youth director for two years from 1986 to 1988.  She described the job as "typing reports, do statistics, church youth activities specified, book for badges," *id.* at 73, holding classes and teaching Sunday school, and with the only lifting involved as being "the crafts and books to conduct classes," at most ten pounds, and lifting that weight frequently, *see id.* at 62, 251, 265.  Although the reason she left this job is not apparent from the record, it is apparent that she did not do so to cease working.  To the contrary.  In 1988, she took on the more strenuous

work as a hotel maid and home health care provider, which involved some heavy lifting.  *See e.g.,* *Record* at 61, 251, 259, 266, 292.

In connection with her first application, the Administration sent Plaintiff for a consultative examination by a psychiatrist.  After noting the psychologist's 1986 assessment, the psychiatrist diagnosed Plaintiff as follows:

> Patient's description of her depressive symptoms appear to be somewhat vague and non-specific.  In addition she has had chronic dysphoria for years.  However, I do not believe that they still meet the threshold for criteria for dysthymic disorder.  They therefore, will be classified under diagnosis of depressive disorder, NOS. No corroborative information was available at the time of the interview from another family member / friend.  It is possible that in view of her long history of dysfunction, a character pathology may be identifiable. Based upon my clinical examination, however, I could not elicit any criteria for a personalty disorder diagnosis. Corroborative information would be needed for this purpose from a family member or friend.
>
> Prognosis poor.  Patient has functioned in this manner for a long period of time.  I think, however, counseling may help as she has to cope and deal with a son who has mild mental retardation.

*Id.* at 186.

The Administration did not sent her for a consultative physical evaluation evidently because, around the time of the psychological examination, someone had referred Plaintiff to Dr. Thomas D. Ramage for a physical examination and report.  This was the "first time" that Dr. Ramage had seen her.  *Id.* at 198. He "gather[ed] that what really precipitated this visit was that she had been ordered back to school or work by a welfare program, called Project Forward."  He went on to state: " I think that, by her own admission, she is upset about that and perhaps looking for some help in that situation.  She has had a tough life."  *Id.* at 196.

Dr. Ramage issued no restrictions in his report. To the contrary, he concluded that despite her "depression, with very poor self image[,] stormy childhood, stormy early adult life . . . in just talking to her . . . the patient appears to be bright and, I think, capable. I think that the greatest thing that could happen to her is this Project Forward and she go to school, learn a trade or a skill. I think that this would be her first step in achievement and would also give her a better image of herself." *Id.* at 198. Finding her "brighter than perhaps people have thought her to be," he "would encourage this lady to go forward and look at life as starting from today." *Id.* at 196.

### B. Consultative Examinations & Limitations re: Second Application

In connection with her second application, where the alleged onset date was 1998, the Administration again referred Plaintiff for a consultative psychiatric examination, and also this time for a physical examination. Dr. Robert L. Karp, who specializes in psychiatry, performed the mental examination and issued a report in February 1999, which is marked as Exhibit B-2F in the record. *See id.* at 311-14 (report); *id.* at 443 (specialty). Based on his observations and findings[1] he concluded: "I don't think that she has any significant impairment currently in her ability to understand or remember basic instructions. She may have some mildly impaired ability to concentrate and persist

---

[1] He observed that "she is friendly and cooperative;" had "good contact with the interviewer and the environment;" she had "no abnormality of speech or psychomotor activity;" she was "able to laugh a few times during the interview, but she also cried when she talked about her son having cancer;" there was "no evidence of hallucinations or delusions" and "she denie[d] perceptual distortions; her "[a]ssociations [were] intac;," "her affect within normal limits," with "no lability or flatness" and "[a]ffect . . . appropriate to content;" she was "oriented in all spheres and is of average intelligence," with "some insight into her situation" and good judgment; she "was able to give abstract interpretations to simple proverbs," "denied suicidal or homicidal ideas," and there was "no evidence of memory deficit for either recent or past memory, or recall on superficial testing." *Record* at 313. He noted her history of recurrent depression, currently "being partially treated with . . . Prozac," although she "still is experiencing some irritability, and insomnia and had suicidal thoughts six months ago . . . energy is low and has some problems concentrating." *Id.* He diagnosed her with "[m]ajor depressive disorder, recurrent, chronic, nonpsychotic, currently mild" with a "Global Assessment of Functioning Scale – 60," defined as "[m]oderate with moderate impairment in social and occupational functioning with somewhat depressed mood, low energy, and insomnia." *Id.* at 313-14.

at tasks of basic work or to interact with the general public and coworkers and adapt to changes in the work place . . . ." *Id.* at 314.

Two different agency physicians completed a Psychiatric Review Technique ("PRT"). Those forms are marked as Exhibits B-3F (*id.* at 315-23) and B-9F (*id.* at 430-38), dated February 9, 1999 and August 24, 1999, respectively. Both appear to be based on Dr. Karp's findings. Neither indicates disabling limitations based on Plaintiff's "mild" depression. *See, e.g., id.* at 318, 322, 431, 437. One reviewer specifically noted that Plaintiff "has a mild depression. The [symptoms] she has do not appear to be a significant factor in her ability to work as she is now working part-time." *Id.* at 316. Another specifically noted that in July 1999, her treating clinic "calls [her] depression 'stable'" and continued her current medication. *Id.* at 431.

Dr. Leonore A. Herrera, who specializes in general surgery, performed the physical examination and issued a report in February 1999, which is marked as Exhibit B-4F. *See id.* at 324-327 (report); *id.* at 442 (specialty). Her February 1999 report notes that the physical examination generally revealed normal ranges in all areas, and that Plaintiff's limitations are pain-based, according to medical records. *See id.* at 324-27.

Two different agency physicians completed Physical Residual Functional Capacity ("RFC") forms. Those forms are marked as Exhibit B-5F (*id.* at 328-35) and Exhibit B-8F (*id.* at 422-29), dated February 25, 1999 and September 19, 1999, respectively. Both appear to be based on Dr. Herrera's findings. Neither indicates disabling limitations based on Plaintiff's degenerative disc

disease and complaints of lower back pain. Both find her capable of light work with some postural limitations that she should only do occasionally.[2]

### C. *ALJ Vanderhoof's Opinion*

ALJ Vanderhoof considered the 1999 examinations, PRT forms, and RFC forms in arriving at his decision. He issued a thorough opinion that clearly sets forth the reasons and evidence upon which he based his findings. It bears setting forth verbatim portions of that opinion.

As to severity of Plaintiff's impairments and whether they meet any listing, ALJ Vanderhoof wrote:

> The claimant alleges the following impairments: diabetes mellitus, obesity, chronic back and multiple joint pain, and depression. I specifically find that the claimant has not met her burden of demonstrating . . . that she has experienced more than a minimal impact on her capacities for work related functioning due to depression, or any other severe underlying psychiatric disorder. This conclusion is supported by the opinions of the medical consultants (Exhibits B-3F and B-9F), and is not inconsistent with the opinion of any treating physician or the evidence.
>
> The claimant's medical records establish that she has been treated with an antidepressant medication by her treating doctor. Her treatment notes indicate that her condition has been stable (Exhibit B-7F). However, her treating doctor gives no indication as to the relative severity of her condition, nor does he indicate that she experiences any

---

[2]"Light work" is defined as involving "lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). The RFC forms are consistent with the weight restrictions for this category of work. While the two conflict in one respect, neither indicates that Plaintiff is unable to stand or walk less than 2 hours in an eight-hour workday with normal breaks. *See Record* at 329 (occasionally lift twenty pounds; frequently lift ten pounds; stand and/or walk with normal breaks for six hours a day; sit six hours a day; unlimited push and pull); *id.* at 423 (occasionally lift twenty pounds; frequently lift ten pounds; stand and/or walk with normal breaks a total of at least two hours a day; sit six hours a day; unlimited push and pull); *id.* at 424 (occasional climbing, crouching, crawling); *id.* at 330 (occasional climbing, balancing, stooping, kneeling, crouching, crawling).

> work related functional restrictions due to it. Because of the lack of objective evidence regarding the claimant's emotional condition, I arranged for a consultative psychiatric evaluation, which was performed on February 1, 1999 (Exhibit B-2F). During the evaluation the claimant reported that she was continuing to work part time as a care provider for an elderly client. She stated that she works 24 hours in a week, and she found it difficult to work at times because of her back pain. She did not describe any work related difficulty due to her emotional condition. She reported instead that she became irritable when her back pain flared up, which occurred about two or three times a week.
>
> The claimant described her daily activities as including such activities as cleaning the house, cooking, doing laundry, taking care of her financial affairs and correspondence, running errands, taking care of her grandchild and visiting with her mother, and taking her son to his sports activities (Exhibit B-2F). She did not report any difficulty completing this rather busy daily regimen due to any mental symptoms or feelings of depression. Moreover, she reported that her medications help her emotional condition "quite a bit." The doctor diagnosed mild depression. He gave his opinion that the claimant had no significant limitation of her ability to understand basic instructions, and that she had only mild impairment of her concentration and persistence, her capacities for interacting with the public and coworkers, and her ability to adapt to changes in the workplace.
>
> The claimant reported during her consultative clinical evaluation performed on February 20, 1999 that her elderly client was recently deceased, and that she would be looking for more work (Exhibit B-4F). The evidence substantiates that no doctor has recommended that the claimant's activities be limited in any significant way due to her emotional condition, that the claimant does not describe any particular functional restriction due to her emotional condition, and that the claimant has been able to work without any difficulty due to her depression.

*Record* at 17.

He found that Plaintiff's complaints were not fully credible, stating:

> The claimant's testimony and reports of symptoms and functional restrictions was not supported by the evidence overall in the disabling degree alleged, and therefore lacked credibility. Her medical records

8

are noteworthy for noncompliance with her diabetes medications, diet, and appointments with her doctor. Her doctor indicates that her diabetes is uncontrolled due to such noncompliance (Exhibits B-7F and B-18F). Her behavior is inconsistent with her complaints regarding fatigue and numbness of her extremities due to diabetes. The claimant's medical records are also noteworthy for possible drug seeking behavior related to her complaints of pain. She has been maintained on Darvocet, a narcotic medication, longterm. This has been prescribed due to the severity of her reported pain in her back and multiple joints. Even so, the claimant has failed to keep appointments for evaluation by an orthopedist referred by her general practitioner, even though she has been reminded and prodded by her doctor to do so.

While the claimant states that she does not get treatments or medications because of her financial problems, there is no evidence that she has ever been refused treatments or medications for failure to afford them. Her treatment notes throughout contain references to the doctor's concern that she has been on narcotic medications longterm, and that her condition needs evaluation by a specialist. On one occasion when she was reminded that she had a long history of narcotics use, she stormed out of the doctor's office and refused treatment (Exhibit B-7F at 20). Her behavior has been inconsistent with the pain level she describes, and is consistent with drug seeking behavior. During her neurological evaluation the claimant's reports of increased sensation to light touch were considered to be inconsistent (Exhibit B-6F). Although the claimant testified that her leg pain and numbness causes (*sic*) her legs to give out, all of her clinical examinations have found full motor strength of her lower extremities, and her EMG testing failed to identify any abnormality which supported her complaints.

While she complains of multiple joint pain, the claimant's clinical examinations since her knee surgery have failed to discover any particular joint abnormality. She retains full ranges of motion of all joints, and her back examinations have found only mildly restricted ranges of motion. Moreover, her neurological evaluation and diagnostic testing has (*sic*) failed to reveal any neurological abnormality. The claimant has reported that she has episodes of severe back pain only two or three times a week, during which she becomes irritable and depressed (Exhibit B-2F). Her reported daily activities describe a busy daily regimen of light activities, and are inconsistent with the pain levels she describes. The same holds true

> with reference to her work activities as an elder care provider during the period under review, which, although they have been only part time, the claimant describes as requiring exertionally medium activities. Although the claimant testified that she is able to lift only 10 pounds, she has inconsistently reported that she lifts 50 pounds occasionally while she is working (Exhibit B-3E).

*Id.* at 18.

Having himself executed the requisite PRT form, *see id.* at 21-23, ALJ Vanderhoof further found that Plaintiff has the residual capacity for light work, which is not significantly eroded by nonexertional factors, stating:

> The claimant has retained a residual functional capacity which supports light work. Nonexertional factors have not significantly eroded this work capacity. This conclusion is supported by the opinions of the medical consultants (Exhibits B-5F and B-8F), and it is not inconsistent with any opinion of her treating doctor, or with the evidence. The claimant's testimony and reports of symptoms and functional restrictions are not fully credible for the reasons stated in Finding #4 [credibility] above. Her medical records indicate that she underwent right knee surgery in May 1998 for chondromalacia and a torn meniscus (Exhibit B-6F at 11). However, her subsequent consultative examination in February 1999 found full ranges of motion and full motor power of her lower extremities (Exhibit B-4F), her neurological evaluation performed in June 1999 found full motor power of all extremities (Exhibit B-6F), and her EMG testing failed to identify any neurological abnormality of any extremity. I note that since her knee surgery no doctor has observed that the claimant is limited by her residual knee condition.
>
> The claimant's lumbosacral MRI found only mild anterior wedging at T12, and degenerative disc disease without thecal sac compression or spinal canal stenosis. The results of that study indicated that the claimant might possibly have nerve root impingement, an equivocal conclusion (Exhibit B-7F at 24). Even so, I find that the evidence substantiates that the claimant has a pain producing back impairment. The issue to be resolved is the relative severity of her symptoms and associated functional restrictions, which is made more difficult because of the multiple inconsistencies I have observed regarding her credibility in the paragraphs above. My review of the evidence

> establishes that the claimant has worked part time as a health care provider for elderly clients performing work activities which she describes as requiring medium exertion, with occasional lifting of 50 pounds (Exhibit B-3E). She reported during her consultative examination in February 1999 that she is looking for more work, presumably of the same kind (Exhibit B-4F). My finding that she is capable of light work requires that she only be able to lift 20 pounds occasionally. Her reports of daily activities are consistent with a daily regimen of light activities (Exhibits B-2F and B-4F). Her clinical examinations have demonstrated no spasms, and the claimant's ranges of back motions are only mildly reduced. She has full motor power in all extremities, and there is no objective evidence by examination or diagnostic testing that she has any neurological impairment.
>
> As for her complaints of multiple joint symptoms, she has no diagnosis of any significant degenerative disease of any upper or lower extremity joint. Her clinical examinations have made few objective findings of any joint abnormalities, and she has full ranges of motions of all joints tested. While her diabetes has been uncontrolled, her records indicate that this is due to noncompliance with treatments and medications. Moreover, there is no evidence that her diabetes has resulted in any end organ damage or other significant work related functional restriction. She has also been noncompliant with her weight reduction diet. Pursuant to 20 CFR 416.930, an individual who has been noncompliant with treatments which are expected to improve her condition will not be found to be disabled under the standards of the Social Security Act. I find no reason to surmise that the claimant has had any orthopedic condition which prevents her from standing and walking for two hours at a time, for as much as six hours out of an eight hour day with brief intervening rest breaks and a meal break, or from bending occasionally throughout the day and lifting 20 pounds occasionally throughout the day. I further find no reason to surmise that the claimant's diabetes and obesity limit her capacities to perform such work activities.

*Id.* at 19-20.

At Step 4 then, ALJ Vanderhoof found Plaintiff not disabled because she could perform past relevant work as "youth director," which was work she herself described as requiring light exertion. *Id.* at 20; *see also id.* at 259 (work history report filed October 1998); *id.* at 265 (heaviest weight

11

lifted was ten pounds, and she "hardly [engaged in ] lifting, only the crafts [and] books to conduct classes").

### *D. Post-Decision Opinions By Treating Physicians*

After ALJ Vanderhoof issued his May 19, 2000 decision, Plaintiff supplemented the record with three pieces of additional evidence on appeal. Two of the documents are styled as "residual functional capacity questionnaires," one for "diabetes" and the other for "physical." *See, e.g., id.* at 452, 457. Nothing in the record indicates who prepared the forms. The forms are different from the Administration's forms and contain no designations that show they are agency forms. Nothing in the record establishes that the Administration provided the forms. Apparently, then, the forms were created and furnished either by the claimant's representative or the physicians themselves.

Plaintiff's treating physician, Dr. Constantino Regalado, filled out and signed the RFC forms, which contain limitations that would preclude even sedentary work. On the other hand, both forms indicate that the doctor's responses are based on what Plaintiff told him during an interview. *See id.* at 453, 456, 458, 461.

The third piece of evidence is a letter dated April 4, 200**2** by Dr. Mario Trance, Clinical Director of La Casa Family Health Center, where Plaintiff has been treated by other physicians. It contains no medical conclusion or opinion:

> I have re-evaluated Ms. Fleury's condition on her last appointment which was April 2, 2002. Her depression and emotions complicate my evaluation, which results in an incomplete evaluation on her range of motion and pain. My recommendation to Ms. Fleury is for a complete psychiatric evaluation as well as an evaluation from a Rheumatologist to evaluate presumptive fibromyalgia. I have came (sic) to the medical conclusion that Ms. Fleury's somatic/body complaints are aggravated by her present psychiatric illness. Her mental needs need to be addressed and treated before I am able to do

>    a complete medical evaluation. I am currently treating Ms. Fleury's
>    medical condition with depression medication, diabetes medication
>    and hypercholestermia medication.

*Id.* at 462.

The Appeals Council stated that it "considered" these two forms and letter, and that they did not provide "a basis for changing the [ALJ's] decision." *Id.* at 8. It did not explain why.

## III. Analysis

Plaintiff's first two issues are based on the same overall contention – that the residual functional capacity assessments provided by Plaintiff's treating physicians after the ALJ rendered his decision should be considered and given controlling weight. Several assertions underlie this argument. She also contends that the ALJ failed to properly apply the Step 4 analysis. *See Doc. 11*. I disagree.

One of Plaintiff's assertions is that the 1986 finding of a Borderline Personality Disorder and the 1995 consulting psychiatrist's prognosis of "poor," is material to this case. Although all of the information from Plaintiff's first application is in the file before me, Plaintiff did not seek review of the first denial and did not request that the Administration reopen the first decision. Nor is she asking that I do so here. Therefore, I find that I need not consider those materials submitted in support of the first application.

Alternatively, Plaintiff takes those two findings out of context and the two findings are overwhelmingly contradicted by other evidence. As set forth above in Sections II. A through II. B, the "borderline" finding was almost ten years before she filed her *first* application, and was made when she was not taking medication for depression. The psychiatrist made the 1995 prognosis of "poor" due to Plaintiff's history, but another doctor disagreed with that prognosis. In addition,

Plaintiff's own work history throughout the 1980's and beyond belies a conclusion that her history of depression precluded her from working. Furthermore, by 1998, when she filed her second application, she was taking medication and both her treating doctors and the consulting doctors found her depression to be "stable" or "mild." Again, she continued to work. Thus, the evidence from the first application that Plaintiff asks me to consider does not constitute substantial evidence of a disabling mental impairment.

Similarly, Plaintiff argues that the 1999 Administration RFC forms which indicate no disabling conditions concerning her back problems, are inconsistent with the evidence. In support, she cites notations from a few medical records that memorialize her chronic complaints of back pain, as well as consulting physician Dr. Herrera's finding that Plaintiff has "[c]hronic lumbosacral dysfunction with a history of herniated disks and probable arthritis," "joint stiffness, pain, and swelling in the hands, probable arthritis in the repetitive action joints and the weight-bearing joints of the lower extremities," "diabetes . . . with blurred vision, paresthesias, chronic infections, and delayed healing," and "multiple motor vehicle accidents with injury to the back." *Record* at 326; *see also Doc. 11* at 5. She cites the belatedly-tendered "opinions" of her treating physicians as further support that her condition is disabling. However, her arguments are unavailing.

First, even though the Appeals Council opinion states that it considered this evidence, it plainly was not required to do so for the following reason. Nothing in the record demonstrates that Dr. Regalado's "RFC" forms or Dr. Trance's letter, "relate to the time period for which the benefits were denied" – that is, from the alleged onset to the date of ALJ Vanderhoof's decision.[3] The

---

[3] Pursuant to 20 C.F.R. § 404.970(b), the Appeals Council is required to consider evidence
(continued...)

"RFC" forms do not describe the period at issue, and evidently are based on an interview that took place around the time the forms were prepared. The letter is plainly based on events post-dating the opinion by two years and offers no opinion whatsoever, much less specific findings about exertional or mental limitations *vis-à-vis* Plaintiff's ability to work.

But even if I consider the new evidence, remand is still not warranted. For a remand to be appropriate, the new evidence much be such that it would have changed ALJ Vanderhoof's decision had it been before him. *See Hargis v. Sullivan,* 945 F.2d 1482, 1493 (10th Cir. 1991); *Carrillo v. Barnhart,* 79 Fed. Appx. 395, 396 (10th Cir. 2003) (affirming *Carrillo v. Barnhart,* CIV 02-90 KBM and citing *Hargis*). The evidence before me does not meet that standard.

As best I understand it, Plaintiff is arguing that ALJ Vanderhoof erroneously relied on the 1999 RFC forms based on the consulting examiners' reports, when he should have based his decision on what is related in the medical reports from the treating doctors. Because those records indicate back problems and pain, Dr. Regalado's "RFC" form deserves more weight. *See Doc. 11* at 8-11. This argument ignores the controlling issue before ALJ Vanderhoof.

---

(...continued)
        submitted with a request for review 'if the additional evidence is (a) new, (b) material, and (c) relate[d] to the period on or before the date of the ALJ's decision.' *Box v. Shalala,* 52 F.3d 168, 171 (8th Cir. 1995) (internal quotation omitted); *see also O'Dell,* 44 F.3d at 858. . . . Evidence is new within the meaning of § 404.970(b) "if it is not duplicative or cumulative," and it is material "if there is a reasonable possibility that [it] would have changed the outcome." *Wilkins v. Secretary, Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991). To be chronologically pertinent, "the proffered evidence [must] relate to the time period for which the benefits were denied." *Hargis v. Sullivan,* 945 F.2d 1482, 1493 (10th Cir. 1991).

*Boone v. Apfel,* 189 F.3d 477, 1999 WL 668253 (10th Cir. 1999).

Because the ALJ specifically found that the back impairment would be pain producing, he therefore had to determine whether Plaintiff's allegations of totally disabling pain were credible and, if not, what degree of limitations she has due to pain. Having reviewed the record, I find that he properly characterized the medical records, testimony, and daily activities. In fact, Plaintiff takes no issue with those characterizations and findings. Further, ALJ Vanderhoof gave valid reasons for discrediting Plaintiff and, again, she takes no issue with those findings.

Whether Plaintiff is disabled is a decision that lies with the Commissioner and treating physician opinions are not dispositive. *Castellano,* 26 F.3d at 1029. Moreover, to be given controlling weight, those opinions as expressed in RFC findings must be "well supported by clinical and laboratory diagnostic techniques ***and*** [cannot be] inconsistent with other substantial evidence in the record." *Castellano,* 26 F.3d at 1029 (emphasis added); *see also* 20 C.F.R. § 404.1527(d)(2). As discussed in Section II, above, none of the medical records support the asserted exertional limitations. Indeed, Dr. Regalado indicates that his assessments are not based on medical evidence but rather on the patient's own reports. Dr. Trance indicates that he needs more tests run before arriving at a conclusion. In light of Plaintiff's uncontested and considerable daily activities, and the fact that Plaintiff worked while applying for benefits, I find that ALJ Vanderhoof could (and the Appeals Council probably did) properly disregard the new "opinions." In short, they are not supported by other medical evidence, do not relate to the period in question, and are overwhelmed by other substantial and uncontradicted evidence based on Plaintiff's own statements. A remand under these circumstances would serve no useful purpose.

Plaintiff also argues that an ALJ must engage in a three-part sequential analysis before making the Step 4 finding. That is, he must: (1) determine the individual's RFC; (2) determine the physical

and mental demands of past work; and (3) analyze whether the RFC level matches the demands of past work.  Plaintiff contends that AJL Vanderhoof erred here because he accepted her description of the youth director job instead of developing facts in the record about what the job required.  Her attorney's brief suggests that her description of the job is suspect because she indicated that she walked 60% of the time, stood 50%, sat 30%, and wrote 10%, for a total of 150% of the day.  Since one must stand to walk,  I do not necessarily find the percentages so aberrant as to question her description.  Significantly, nowhere does counsel set forth an argument, or evidence, that the youth director job involved something other than light work.

In any event, because Plaintiff provided a detailed description of the prior job as youth director, the record is not "devoid" of evidence such that a remand is necessary.

> Finally, Ms. Westbrook argues that the ALJ failed to discuss the demands of her past relevant work.  She cites *Winfrey* in arguing that the ALJ's findings were not particularly precise enough to satisfy that case's mandate of specific findings at each of the three phases of step four. . . .Our holding in *Winfrey,* however, is not designed to needlessly constrain ALJs by setting up numerous procedural hurdles that block the ultimate goal of determining disability.  Rather, its concern is with the development of a record which forms the basis of a decision capable of review. . . . In *Henrie,* we found that there was no inquiry whatsoever regarding the demands of past relevant work, and that the prior occupation was never even mentioned in evidence.  With a record devoid of even any mention of the demands of past relevant work, we were compelled to remand the case for the ALJ to develop that record, despite the claimant's ultimate burden of proof. . . . In the present case, the record is not devoid of evidence of the demands of Ms. Westbrook's past relevant work.  On the contrary, it includes inquiry at the hearing *as well as an earlier description of that work by Ms. Westbrook herself.*  The ALJ's specific functional demand finding also referred to his earlier finding of residual functional capacity, which, as we have already said, was based on substantial evidence. The ALJ also specifically found that there was no evidence to support a finding that Ms. Westbrook had any mental limitations on her ability to perform semi-skilled work.  A more detailed finding that

>independently examined the objective mental demands of an administrative assistant was entirely unnecessary, given the lack of medical evidence demonstrating Ms. Westbrook had a severe mental impairment requiring consideration with those demands. In sum, the record as a whole was adequately developed and supports the ALJ's ruling that Ms. Westbrook could return to her past relevant work, and we conclude that the ALJ's decision was based on substantial evidence. [Emphasis added.]

*Westbrook v. Massanari,* 26 Fed. Appx. 897, 903 (10th Cir. 2002) (affirming *Westbrook v. Massanari,* CIV 99-1472 MV/DJS).

## IV. CONCLUSION

Based on the foregoing review and analysis, the Court will **DENY** Plaintiff's motion and **AFFIRM** the finding of the Commissioner that Plaintiff is not disabled within the purview of the Social Security Act, which is consistent with the regulatory criteria set forth therein. The Court **FINDS** that there is substantial evidence in the Record to support the ALJ's decision and that the ALJ correctly applied the Agency's regulations.

**WHEREFORE, IT IS HEREBY ORDERED** that Plaintiff's motion *(Doc. 11)* is **DENIED**, and the decision of the Commissioner is **affirmed**. A Final Order will be entered concurrently herewith.

**IT IS SO ORDERED.**

_Lourdes A. Martínez_
**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by consent.**